UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 26-CR-109

DEMARYL HOWARD,

Defendant.

---

UNITED STATES' SENTENCING MEMORANDUM

---

Over the course of several years beginning around 2018, Milwaukee saw an epidemic of public benefits fraud related to prenatal care coordination (PNCC) and childcare coordination (CCC) services. The PNCC and CCC benefits are Wisconsin Medicaid benefits designed to connect at-risk pregnant women and mothers of young children with medical, social, emotional, and educational resources, with the goal of improving birth outcomes and supporting healthy parenting. They are intended to help address, among other harms attendant with childbearing and childrearing in poverty, the tragedy of infant mortality—something mothers in Wisconsin, and especially Black and Hispanic mothers in Wisconsin, experience at an alarmingly high rate.

But Demaryl Howard, and others like him who saw an opportunity to take advantage of a system reliant on providers' honesty, abused this benefit program to

amass a quick fortune based on lies and bribes. Instead of providing needed care coordination to an at-risk population in his own community, Howard and his employees recruited Medicaid-eligible women by promising them free baby supplies in exchange for signing up with Howard's company, Fortunate Futures. Howard then billed Medicaid as if Fortunate Futures was providing actual, reimbursable services, when in fact the company was providing, at most, more bribes in the form of occasional deliveries of diapers, baby wipes, and cash.

Howard instructed his employees to document in their billing paperwork that they worked with clients the maximum amount of time each month that Medicaid would reimburse, knowing that his employees were actually spending little or no time with their clients, and were not providing the kinds of services the benefit is meant to cover. And he profited richly; over the course of just three and a half years between January 2019 and May 2022, Howard's company stole more than $4.3 million of taxpayer funds that were meant to help struggling women and children.

Howard will be the fourth defendant sentenced in this district for his role in a PNCC/CCC fraud. As described further below, two other defendants who committed similar PNCC/CCC frauds (but profited significantly less than Howard), and who took their cases to trial, received sentences of 111 and 121 months, respectively. The third defendant, who was sentenced after agreeing to plead guilty, received a sentence of 60 months.

The seriousness and extent of Howard's fraud, the vulnerability of the people he harmed, and the critical need to ensure deterrence and avoid unwarranted sentencing disparities all militate toward a significant period of incarceration in this case. Indeed, this case presents a somewhat unique circumstance in which the high Guideline range for a fraud crime (based largely on loss amount) quite accurately reflects the seriousness of the offense. In light of the facts of the underlying crime, but also Howard's acceptance of responsibility for his role in it, the government submits that a below-Guidelines sentence of 54-months' incarceration is a just and reasonable sentence in this case.

## I. Nature and Circumstances of the Offense.

### A. Howard's Fraud Scheme Was Intentional and Harmful.

This is not a case about a health care provider who up-coded claims for services he and his employees actually provided to make an extra buck. It's not about a legitimate business with an off-the-books side hustle. Howard's entire PNCC/CCC business was permeated with fraud. After first enrolling as a Medicaid-approved PNCC/CCC provider in 2015, and quickly learning how easy it was to bill Medicaid for PNCC/CCC services without anyone confirming the accuracy of his bills before paying them, Howard, along with his business partner Pongella Welch, started to bilk the system.

In both 2016 and 2018, the Wisconsin Department of Health Services (DHS) audited Fortunate Futures. Both audits found issues with every patient file reviewed—Howard's company was billing for non-covered services and not documenting the work

for which he was billing (suggestive of the fact that no one was actually doing the work). As a result, Howard agreed to repay the overpayments identified in the audits. And he also told DHS that he agreed with the audit findings and that he would incorporate better self-audit procedures.

Instead, he ramped up his fraud. In January 2019 (the start of the charged fraud scheme), Howard revalidated Fortunate Future's enrollment with Medicaid as a PNCC/CCC provider, again promising (as he did when he first enrolled in 2015) that he would submit only truthful and accurate claims. He was well aware that his company had submitted claims based on false or insufficient information in the past—both because he was directing that it happen, and because the DHS audits confirmed it. He was also well aware that Medicaid was motivated to find and stop fraudulent billing; he knew the regulators' eyes were on him. Despite this, from January 2019 through May 2022 (when DHS suspended Medicaid payments to his company), Howard billed Medicaid as though his employees were meeting with all of their clients for two hours at a time, multiple times per month—all while knowing that, in fact, his employees were meeting with their clients little or not at all, and providing bribes, not covered services. In short, his fraud was as brazen as it was profitable.

Howard's business strategy was focused on billing Medicaid for as much as possible, rather than actually making a difference in the lives of his company's clients. As recounted in the Presentence Report (PSR), Howard told his employees (care

coordinators) to offer items of value, including baby supplies and gift cards, to potential and current clients to encourage them to enroll and remain enrolled with his company. He also told his employees not to document the fact that they gave away items of value because those things would be considered bribes. Once a client was enrolled, Howard instructed his employees to document (on time sheets called "progress notes") that each of their purported visits with clients lasted two hours, regardless of how much time (if any) the employee actually spent with the client. Howard also instructed employees to document that they always spent ten hours per month assisting each client (the maximum amount Medicaid would reimburse per month for ongoing CCC care).

And Howard ensured his employees would participate in this fraud with him by making it financially beneficial for them; Howard incentivized his employees to inflate their hours by tying their compensation to the number of hours they (purportedly) worked for clients. When the employees fabricated their billing sheets (at Howard's direction), they made more money and he made more money.

What Howard did *not* do was educate and train his employees to actually provide meaningful care coordination. When administered properly, the PNCC and CCC benefits reimburse a service that is akin to social work or case management. The care coordinator identifies an at-risk pregnant woman or new mother, and then goes over with her a detailed questionnaire to both ensure she qualifies for the benefit and to identify the specific areas of her life that are especially challenging—where she could use support.

Then the care coordinator, in consultation with a "qualified professional" (someone with relevant education or training, such as a nurse), develops a care plan for that client—a roadmap for how the care coordinator will help the client meet goals such as finding a doctor, getting help with drug or alcohol dependency, enrolling in food share, finding reliable transportation to appointments, and seeking employment. And then the care coordinator spends meaningful time guiding the client to those resources and checking in with her to talk about her progress and her continued needs.

Howard did not train his employees to do any of this. Investigators interviewed half a dozen former Fortunate Future care coordinators, who confirmed that the training provided by Howard and Welch focused primarily on teaching them how to complete billing forms and the money being made. Some indicated that Howard and Welch provided them with some flyers or basic information about resources for pregnant women and mothers, but they received little else by way of training or follow-up to ensure they were actually providing resources in the way intended by the benefit. The care coordinators also acknowledged that they did not spend two hours at a time with clients (as the billing claimed), and that they sometimes didn't have contact with clients at all, despite preparing paperwork that Howard then used to submit bills to Medicaid for those clients.

Moreover, by January 2019, Howard was the only person at Fortunate Futures who was a "qualified professional" (he met the requirements for that role based on his

degree in human services). And although the Medicaid rules require that a qualified professional review every client questionnaire to determine eligibility and every care plan to ensure the appropriate needs and goals are identified and that progress is made toward those goals, Howard never, or almost never, substantively reviewed questionnaires and care plans. In fact, his employees commonly did not even prepare questionnaires and care plans for the clients for whom bills were submitted, because Howard never asked for them—they all shared the understanding that the company was not actually providing the services the benefit was intended to cover, so there was nothing to document.

All of this meant that Fortunate Futures was regularly, (1) "enrolling" clients by collecting their contact information and never following up with them or providing any services, but billing Medicaid as if they were, (2) enrolling and billing for purported services to clients who did not actually qualify for the benefit (for example, some Fortunate Futures "clients" were not pregnant and did not have young children, or did not demonstrate any of the risk factors that qualify a person for PNCC/CCC services), and (3) giving women token supplies of diapers, other baby items, and even cash to keep them enrolled so Fortunate Futures could continue billing under their names. The primary "work" of Howard's business was recruitment of clients (the care coordinators finding women in the community who would give them their identifying information for billing Medicaid), promising free items (and sometimes delivering), and filling out

paperwork to substantiate bills to Medicaid.

While Howard's company made millions, the women he was entrusted to serve were left without the care coordination they needed—often not even knowing it was available to them, or that Howard was billing Medicaid as if he was providing it to them.

**B. Howard's Fraud Significantly Impacted the Community.**

This fraud was not a "victimless" crime. The government is, of course, a victim here. The perception that healthcare fraud harms no one because the pecuniary victim isn't a person is woefully short-sighted. But one need not consider the more systemic harms caused by Howard's fraud to see the devastating impact it had on the community. That is because Howard's fraud took advantage of a program that was intended to help some of the most vulnerable women in our community, and because of his fraud and others like it, millions and millions of dollars meant to be spent on at-risk pregnant women and mothers in Milwaukee instead lined the pockets and filled the bank accounts of PNCC/CCC company owners. And Howard's crime also hurt the people he was entrusted to help because he used their identities to bill Medicaid as if they were receiving PNCC/CCC services, thereby making it difficult for them to get help elsewhere.

But the impact of Howard's fraud goes beyond the individual. Healthcare is big business. The United States spent $5.3 trillion, or 18% of GDP, on health spending in 2024.[1] The National Bureau of Economic Research (NBER) notes that "improper

[1] https://www.ama-assn.org/about/ama-research/trends-health-care-spending

payments in federal health insurance" cost the United States more than $100 billion in 2023.[2] According to the NBER, "healthcare fraud in the US alone is comparable in magnitude to the annual budget of the SNAP program or the GDP of Kenya." *Id.* These are large dollar amounts, and when they are siphoned off from the health system for fraud, it reduces available services and raises the cost of healthcare for every American. Those harms are not speculative. The rampant fraud in the PNCC/CCC program at issue here has resulted in a significant reduction in the program's availability in Milwaukee. Thus, as a direct result of Howard's greed, there is now less help available to vulnerable women with young children.

## II. The Sentencing Guidelines, Avoiding Unwarranted Sentencing Disparities, and Howard's Acceptance of Responsibility.

As noted at the outset of this memorandum, three other defendants in this district have been sentenced for PNCC/CCC frauds. Precious Cruse owned and operated Caring Through Love, which fraudulently billed Medicaid more than $943,000 and was paid more than $780,000 as a result during its nine months of operation. At a jury trial last year, Cruse was convicted on all counts of a seventeen-count indictment charging her with healthcare fraud, false statements related to healthcare matters, anti-kickback statute violations, money laundering, and aggravated identity theft. *See United States v. Cruse*, 23-CR-149-PP (E.D. Wis.). District Judge Pamela Pepper sentenced Cruse to 111 months

[2] https://www.nber.org/system/files/working_papers/w33592/w33592.pdf

of imprisonment.

Markita Barnes owned and operated Here For You Prenatal, which fraudulently billed Medicaid more than $3 million and was paid more than $2.3 million as a result during its fourteen months of operation. At a jury trial last year, Barnes was convicted on all counts of a twenty-count indictment charging her with healthcare fraud, false statements related to healthcare matters, anti-kickback statute violations, money laundering, obstruction, and aggravated identity theft. *See United States v. Barnes,* 23-CR-113-PP (E.D. Wis.). District Judge Pamela Pepper sentenced Barnes to 121 months of imprisonment.

Lakia Jackson owned and operated We Care Services, which fraudulently billed Medicaid more than $3.3 million and was paid more than $2.6 million as a result during its twenty months of operation. Jackson entered a plea agreement with the government and ultimately pled guilty to health care fraud and aggravated identity theft. *See United States v. Jackson,* 24-CR-198-PP (E.D. Wis.). Upon the government's recommendation for a below-Guidelines sentence, to account for her acceptance of responsibility, District Judge Pamela Pepper sentenced Jackson to 60 months of imprisonment.

Howard's fraud is similar to those perpetrated by Cruse, Barnes, and Jackson in nearly all facets. Cruse, Barnes, and Jackson, like Howard, organized their companies as recruitment and billing machines; they hired dozens of care coordinators whose job it was to find pregnant women and new mothers in the community who they could enroll

with the company for "services." They, like Howard, instructed their coordinators to offer items of value to entice women to enroll. In fact, they, like Howard his employees, falsely described the PNCC/CCC benefit to potential clients as a government program that provided free baby supplies, so that women would want to enroll and not expect any actual, meaningful services, but only the continued delivery of those small bribes. And they, like Howard, instructed their care coordinators to prepare billing paperwork documenting that they spent two hours per visit with their clients, five times per month (regardless of time actually spent, if any), so that the company could bill Medicaid the maximum reimbursable amount for each client. Across all of these companies, the clients were getting the same thing—promises about free items and sometimes the delivery of those items, occasional texts about resources like housing or employment, and almost nothing more. The fact that several PNCC/CCC agencies in Milwaukee were conducting the same fraud in the same manner meant that pregnant women and mothers in the community did not even know that the PNCC/CCC benefit was supposed to provide them with something different—something actually useful to them.

But Howard's fraud was also different from those orchestrated by Cruse, Barnes, and Jackson in a few ways, both mitigating and aggravating. First, Howard did not advertise his company's services publicly on social media and through community give-away events like the other PNCC/CCC owners did. Cruse, Barnes, and Jackson all posted advertisements to their Facebook accounts offering free items to women who enrolled

with them, and they hosted community "baby showers" where they gave away diapers, wipes, car seats, and strollers to women who signed up. This conduct not only drew them clients, but it also fed the misunderstanding among community members that the PNCC/CCC benefit was designed to provide token baby supplies and not actual care coordination services.

Howard "advertised" through his care coordinators by sending them into the community to find potential clients, and tying their compensation to the number of clients they had (and number of hours billed). To be sure, Howard likely benefitted from the advertising efforts of other PNCC/CCC owners in the Milwaukee area at the time, who garnered community interest in the benefit program. But he did not mass-market the way other PNCC/CCC owners did. For that reason, the government did not recommend, and the PSR does not include, a two-level mass marketing enhancement under United States Sentencing Guidelines Section 2B1.1(b)(2)(A)(ii); the other PNCC/CCC owner-defendants all received that enhancement.

Next, Howard did not, himself, act as a care coordinator, and although he was, as the owner of the company, ultimately responsible for the accuracy of all claims he submitted, he delegated some of the company's operations to others, including his manager, Ms. Welch. Cruse, Barnes, and Jackson all acted as care coordinators themselves, billing Medicaid for clients who they said they were personally serving, even though they were largely providing either token bribes or nothing at all. For those clients,

the owners pocketed all of the Medicaid reimbursements; they didn't have to share a percentage with another care coordinator. And Cruse, Barnes, and Jackson directed all aspects of their businesses. They hired staff, they put on the trainings, they reviewed coordinators' paperwork, and they entered or directly oversaw the entry of billing.

Howard's management of his company was slightly different. He relied heavily on Ms. Welch, who had prior experience working as a care coordinator for a different PNCC/CCC company, and he outsourced the actual submission of claims to a third-party billing service, eBix. Ms. Welch helped him recruit staff and conduct trainings. She interacted with the care coordinators, answering their questions about how to fill out their progress notes. They, together, instructed the coordinators to inflate their billing and to doctor their paperwork. To be sure, Howard knew his coordinators were not providing the hours of services for which he was billing Medicaid, and that they were not providing the kinds of care the benefit actually covered. And he knew the information he sent to eBix for billing was not accurate, and that eBix would have no way to know. He collected millions while leaving much of the day-to-day work either to Ms. Welch or others (like training and being physically present at the office to collect and review paperwork) or totally undone (like reviewing questionnaires and care plans as the company's only qualified professional). Based on this leadership role, the government agreed to recommend, and the PSR includes, only a two-level leadership enhancement under United States Sentencing Guidelines Section 3B1.1(b). The other PNCC/CCC

owner-defendants received four-level leadership enhancements.

And finally, as to potentially mitigating differences, Howard was not charged with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A, which carries a mandatory consecutive penalty of two years' imprisonment. Cruse and Barnes were convicted of aggravated identity theft at trial, and Jackson pled guilty to aggravated identity theft. The Section 1028A charges in all three of those cases were premised on the defendants' use of identifying information from clients or potential clients to submit bills to Medicaid for services that never happened, and that could not possibly have happened, because they were purportedly performed on dates before the client ever met or interacted with the defendant or her company. In other words, Cruse, Barnes, and Jackson signed up clients with young babies and then back-dated claims as if they had met, enrolled, and served those clients weeks or months earlier, often all the way back in time to shortly after the baby was born.

To be sure, Howard's fraud certainly involved billing for "ghost" services—meaning not just upcoding bills for services actually provided, but instead billing for entire interactions that never happened. A clear example is laid out in the count of conviction. That count describes a bill that Fortunate Futures submitted to Medicaid for 10 hours of services that Howard's company purportedly provided to T.C.-C. on September 18, 2021. But T.C.-C. had died a month earlier on August 18, 2021, and therefore no services were (or could have been) provided to her on September 18, 2021.

But the government did not charge, and Howard has not been convicted of, aggravated identity theft, which is a point of distinction between this case and that of Cruse, Barnes, and Jackson.

But Howard's fraud was also more aggravated than those orchestrated by Cruse, Barnes, and Jackson in at least two ways. First, he stole a lot more money. As compared to the actual loss amounts (the amounts Medicaid paid) for Cruse, Barnes, and Jackson of $780,000, $2.3 million, and $2.6 million, respectively, Howard was paid just shy of $4.4 million. And that loss amount includes only the billing that Howard submitted starting in January 2019 (the start date of the charged scheme, when Howard revalidated his company's enrollment with Medicaid), even though he started his company in 2015 and two DHS audits of his company prior to 2019 (in 2016 and 2018) also found problematic billing practices consistent with the charged fraud scheme. Second, and relatedly, Howard carried on his scheme for a longer period, even after being warned by DHS through the audits that his billing practices were problematic and that DHS was watching. In other words, Howard had plenty of notice and opportunity to right the ship, and instead he chose to continue his fraud.

All that said, Howard has now demonstrated sincere and meaningful acceptance of responsibility by admitting his conduct and pleading guilty. By doing so, he has saved the government the tremendous resources that would be required to put on another complex PNCC/CCC fraud trial, and he spared the victims of the fraud (the women he

was supposed to be helping) from having to come to court to testify.

A sentence of 54 months, slightly below the low end of the Guidelines, and slightly below the sentence Jackson received after pleading guilty to a similar crime (that netted her half as much money, but which included a conviction on Section 1028A), will account for Howard's conduct and his contrition, while also ensuring that similarly-situated defendants are treated similarly.

### III. Deterrence and Respect for the Rule of Law.

Finally, in addition to considering the nature of the offense, the defendant's characteristics, and the sentencing guidelines, Section 3553(a) counsels the Court to consider the need to promote respect for the rule of law and deterrence.

As just described above, Howard was warned about his fraudulent billing practices (twice) and chose to continue his scheme. That fact alone is indicative of a need for specific deterrence. But Howard's background, education, family circumstances, and current employment, as described in the PSR, also demonstrate that he has the tools and support to succeed in a lawful career after his sentence. And his acceptance of responsibility in this case is a good first step toward showing contrition and respect for the law.

But general deterrence also matters here. Courts in this circuit have repeatedly held that the concept of general deterrence "may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are rational actors who

would be dissuaded by the prospect of prison." *United States v. Goss*, 325 F. Supp. 3d 932, 935 (E.D. Wis. 2018). The Seventh Circuit has also endorsed the idea that "white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)).

That is a particularly salient consideration here. The Milwaukee PNCC/CCC fraud cases have garnered significant media attention from their inception. The public is paying attention to what the Court does here. And healthcare fraud in low-skilled, but critical, services, like prenatal care coordination, personal care services, and the like is on the rise. People perceive white-collar offenses to carry not only a lower risk of personal harm than violent or drug crimes, but also a lower risk of significant prison time. And when people like Howard believe they can make millions by taking money from the government and be subject to little or no punishment because fraud is hard to investigate and sentences are lenient, fraud is more likely to proliferate. It is, therefore, necessary to send a message to individuals, like Howard, who are calculating and comparing the risks and rewards of defrauding benefit programs, that doing so will result in significant prison time.

## IV. Conclusion

Howard structured his business to steal money from the government. He put together a staff of people from the community and used them to commit the crime, while he mostly sat back and collected the profits. And he took advantage of vulnerable young

women and children who actually needed the services he was being paid to provide.

For all of the reasons discussed herein, the government recommends that this Court sentence Howard to 54 months of imprisonment, which is below the low end of the applicable Guidelines range, as it is calculated in the PSR. That sentence accounts for the Section 3553(a) factors and the need to ensure that similarly situated individuals are treated similarly.

Dated at Milwaukee, Wisconsin, this 18th day of September, 2026.

Respectfully submitted,

By: *s/ Kate M. Biebel*

Kate M. Biebel
Julie F. Stewart
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1727